**WESTWEGO CITIZENS FOR BETTER GOVERNMENT, et al., Plaintiffs–Appellants,**

v.

**CITY OF WESTWEGO, etc., et al., Defendants–Appellees.**

No. 89–3552.

United States Court of Appeals, Fifth Circuit.

July 16, 1990.

Alice M. Jacobs, Jacobs, Jernigan & Weiner, Metairie, La., Ronald L. Wilson, Terry E. Allbritton and M. David Gelfand, New Orleans, La., for plaintiffs-appellants.

Robert B. McDuff, Lawyers' Committee for Civil Rights, Washington, D.C., for amicus curiae.

Jon A. Gegenheimer, Harvey, La., and John J. Molaison, Jr., Westwego City Atty., Gretna, La., for City of Westwego, et al.

Before KING, JOHNSON and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

Westwego Citizens for Better Government, et al. (Citizens) appeals from the district court's ruling on remand that Citizens failed to make out a vote dilution claim for aldermanic elections in Westwego. Unfortunately, we must defer ruling on Citizens' appeal because we conclude that the district court must hear new evidence proffered by Citizens of a recent indigenous election involving the first black aldermanic candidate in Westwego. The district court must also consider proffered data regarding the voting age population in

proposed black-majority single-member districts, in view of the fact that we specifically remanded because the record was "unclear" and ordered the district court to make a determination on this issue. We remand to the district court for further proceedings, including a hearing to consider the proffered evidence, and for such modifications in the district court's ruling as are necessitated by the evidence adduced at that hearing. Following such supplemental briefing as may be presented by the parties, we will then address the merits of this appeal.

## I.

This case was remanded to the district court for further proceedings in accordance with our opinion filed May 8, 1989. *Westwego Citizens for Better Gov't. v. City of Westwego*, 872 F.2d 1201 (5th Cir.1989). In that opinion, we noted that it was not clear from the record whether there would in fact be a black majority of voting age in the proposed single-member districts contemplated by Citizens' pleadings, and we directed the district court to resolve this ambiguity on remand. *Id.* at 1205 n. 4. We also addressed certain errors of law the district court allegedly made "in order to provide guidance for the *proceedings* on remand." *Id.* at 1204 (emphasis added). Shortly after we issued our mandate, and without any consultation with the parties or further proceedings, the district court promptly entered Supplemental Findings of Fact and Conclusions of Law in which the court held that there was no evidence in the record to support the conclusion that blacks would constitute a majority of the voting age population in any proposed single-member district. The court further held that Citizens had not sustained their burden of proving that whites would vote as a bloc to defeat a black candidate for alderman in Westwego. The district court was not persuaded that the racially polarized voting in numerous other exogenous elections was sufficient to establish that whites would vote as a bloc in an indigenous Westwego aldermanic election involving a black candidate. The district court entered judgment for the defendants on

June 30, 1989. Within ten days after entry of judgment, Citizens filed a motion asking the district court to amend its findings and conclusions to take into account developments in the two years since the case was originally tried, specifically the fact that in March 1989 an election for the Westwego Board of Aldermen was held in which, for the first time, a black candidate, Glenn Green (Green), had run. Citizens proffered evidence that the voting in the March 1989 aldermanic election indicated high racial polarization, and claimed that the results of the election would prove exactly what the district court held Citizens had failed to sustain—that whites would vote as a bloc to defeat a black candidate in an election for aldermen.

Citizens also proffered evidence that the black voting age population exceeded 50% in certain hypothetical districts and that, in those districts, the minority group possessed the potential to elect candidates of its choice. This evidence included black voter registration data and data from the 1989 election for aldermen. Citizens also indicated that they would be able to acquire voting age population data from the Census Bureau.

## II.

■ At the outset, and in fairness to the district court, we note that the district court may have believed that reopening the record was beyond the scope of our mandate. Our prior opinion was concededly geared toward the need for specific findings. 872 F.2d at 1204 ("we must remand this case to the district court so that it can make specific findings"). However, we also indicated that remand contemplated further "proceedings," *id.*, and, as to evidence of the first *Gingles* factor, we specifically acknowledged that the record was "unclear" on the voting age population issue discussed *infra*, and instructed the district court to make a "determination on remand." *Id.* at 1205 n. 4. This circuit has previously held that where we remand for further findings but also note that additional "proceedings" may be involved, our man-

date does not "tie the lower court's hands ... to a bedpost forcing it to stare only at" the record before it. *Doran v. Petroleum Management Corp.*, 576 F.2d 91, 92 (5th Cir.1978); *see also Pittsburgh Press Club v. United States*, 579 F.2d 751, 755 (3d Cir.1978) (remand for district court to make "more specific findings" based on evidence "disclosed by the record" did not preclude district court from reopening the record to take additional evidence). Thus, our mandate was not so narrow as to preclude the district court's consideration of the proffered evidence that is the subject of this opinion. Indeed, given the frailties of the record before the district court and us, as well as our request for a determination as to voting age population, additional evidence, if available, was indicated.

### III.

■ We first consider whether the district court erred in refusing to consider the results of the first Westwego aldermanic election involving a black candidate. According to Citizens' proffer, the black candidate, Green, received 89% of the black vote and 16.8% of the white vote. However, Green did not win or make the runoff. In an affidavit attached to Citizens' proffer, Professor Douglas Rose, an expert previously found credible by the district court, stated that white bloc voting defeated the combined force of a considerable majority of black voters and crossover white voters. He also concluded that the results of the aldermanic race were consistent with his testimony as to other exogenous elections involving black candidates. Finally, Professor Rose concluded that, had the single-member district scheme been in place, Green would have garnered a majority in the proposed black-majority districts.

When this case was first before the district court, it found "significant the fact that no black had run for alderman" and the court concluded that, absent such evidence, Citizens could not make out a vote dilution claim. We reversed—concluding

that Citizens could make out its claim of vote dilution based solely on exogenous elections. *Westwego*, 872 F.2d at 1208–10; *see also, Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 502–03 (5th Cir.1987). Our decision rested on the notion that blacks often do not sponsor a black candidate because of the "very barriers to political participation that Congress sought to remove." *Westwego*, 872 F.2d at 1208–09 n. 9; *see also, McMillan v. Escambia County*, 748 F.2d 1037, 1045 (5th Cir. 1984) ("the lack of black candidates is a likely result of a racially discriminatory system"). We remanded with instructions that "plaintiffs' claims should stand or fall based upon the probative value of the evidence of racial bloc voting they *have* adduced, along with the presence or absence of other facts demonstrating a lack of access to the political process." *Westwego*, 872 F.2d 1209–10 (emphasis in original). Moreover, we instructed the district court "to explain specifically which evidence it finds credible and which it does not...." *Id.* at 1210 n. 9. We emphasized, however, that the district court "may not disregard such evidence altogether on the view that no one can determine how Westwego's white voters would respond to a black candidate until there is one." *Id.*

On remand, the district court reviewed the exogenous elections. The district court found credible Professor Rose's conclusion that those elections evidenced racially polarized voting. The court also noted that the defendant's expert had conceded "that a black candidate could not be elected under Westwego's present system of electing alderman." Finally, the district court agreed with both experts' testimony that "the extent of racially polarized voting should not differ between different types of elections."[1] Having not made any negative determinations regarding the credibility of the proof of racial polarization, the district court held:

Nevertheless, we find that plaintiffs have not sustained their burden to prove

---

1. In addition, the district court found that Citizens' proof established the existence of political

cohesion within the minority group.

that whites would vote as a bloc to defeat a black candidate for alderman in Westwego. In reaching this conclusion, we draw on our "familiarity with the political realities of the local area."

■ *Gingles* teaches that where only few (or even no) indigenous elections include black sponsored candidates, a vote dilution claim is not foreclosed:

> Where a minority group has never been able to sponsor a candidate, courts must rely on factors that tend to prove unequal access to the electoral process. Similarly, where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available does not foreclose a vote dilution claim.

*Thornburg v. Gingles,* 478 U.S. 30, 57 n. 25, 106 S.Ct. 2752, 2770 n. 25, 92 L.Ed.2d 25 (1986). Moreover, given the long term nature [2] and extreme costs necessarily associated with voting rights cases, it is appropriate to take into account elections occurring subsequent to trial. *See Collins v. City of Norfolk,* 679 F.Supp. 557, 569 (E.D.Va. 1988); *Collins v. City of Norfolk,* 883 F.2d 1232, 1243 (4th Cir.1989) (trial originally

held in 1984 but subsequent elections considered by both trial court and appellate court). The proffered evidence in the instant case concerned the first aldermanic race involving a black candidate. The district court erred in refusing to consider this highly relevant evidence. Therefore, we remand to the district court for further proceedings in which the plaintiffs will have the opportunity to present the results of the 1989 aldermanic election.

## IV.

■ We next address whether the district court erred in failing to take evidence that the minority group was sufficiently large and geographically compact to possess the potential to elect representatives of its choice under a single-member district scheme. *Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17. In our prior opinion, we concluded that the record was "unclear" as to whether blacks could constitute a "majority of the *voting age* [population] in a single district...." 872 F.2d at 1205 n. 4 (emphasis in original). We directed the court "to make this determination on remand." *Id.*[3] The district court did not

---

**2.** In the instant case, over two years have passed since the original trial.

**3.** At trial, Citizens' evidence indicated a majority black population in certain proposed districts, but voting age data by race was not presented. Citizens' failure to present such evidence was understandable. First, the relevance of voting age data under the *Gingles* test was not clear until after trial in this matter. *See generally Jones v. City of Lubbock,* 640 F.2d 777 (5th Cir.1981) (plaintiffs in voting rights action permitted to present further evidence on remand in light of intervening Supreme Court decision because "when the rules of the game are changed, the players must be afforded a full and fair opportunity to play by the new regulations") (Goldberg, specially concurring). Second, as Citizens explained at trial and in their proffer, the Census Bureau does not generally divulge voting age population data by race for certain small areas. *See* Bureau of the Census, *General Social and Economic Characteristics: Louisiana,* at vi (1983) ("To maintain the confidentiality promised respondents and required by law, ... the Census Bureau suppresses data for characteristics which are based on a small number of persons and/or housing units in the geographic area."); *see also* Allbritton, *Fifth Circuit Survey: Voting Rights,* 21 Texas Tech.L.Rev. 565, 572–80 (1990) (noting difficulties in obtaining voting

age population "census data for small communities ... because of the confidentiality guaranteed by the census"). According to Citizens, the Census Bureau releases voting age population data on a "block group level." A block group is composed of several city blocks. Citizens' proposed black majority districts include only parts of certain block groups. For these small areas, confidentiality requirements come into play. However, according to Citizens' proffer, voting age population data for Citizens' proposed black majority districts can now be obtained through the Census Bureau.

If, because of difficulties in the way in which the Census Bureau reports voting age population, Citizens is unable to produce hard data on the black voting age population in the proposed districts, then other probative evidence may be considered, including: unsuppressed minority voting age population data, registered voter data by race (along with comparative voter registration rates of blacks and whites), total population data by race, and any other probative data suggesting that blacks possess the potential to elect representatives of their choice in the proposed districts.

Finally, we note, as we did in our prior opinion, that "[i]f it appears that no single district with a black majority of voting age could be created without increasing the number of alder-

attempt to resolve the ambiguity we identified through the aid of additional evidence. Instead, the district court made a determination "based upon a review of the record and transcript which were before the Court of Appeals." The court held that "there is no evidence in the record to support the conclusion that blacks would constitute a majority of the voting age population in any district formed under the five district plan." Thus, the court concluded that the plaintiffs had failed to draw a district which had a sufficiently large and geographically compact minority group to possess the potential to elect representatives of its choice. The district court denied Citizens' motion asking the district court to amend its findings and conclusions to take into account evidence addressing this issue. The evidence proffered would have allegedly proved that blacks constituted a majority of the voting age population in certain hypothetical districts and that, in those districts, blacks possessed the potential to elect candidates of their choice. Specifically, Citizens proffered:

(1) evidence as to the number of registered black voters in the hypothetical districts,

(2) evidence that Green, the black candidate in the March 1989 election for aldermen, received 52% of the vote in those districts, and

(3) an affidavit of Cedric Floyd indicating that the Census Bureau or certain state agencies could provide black voting age population data for the proposed districts.

Minority voting age population data, minority voter registration data and evidence of success by minority preferred candidates is relevant to the first *Gingles* factor. Under *Gingles*, a minority group should, as a threshold matter, show that it is sufficiently large and geographically compact to constitute a majority in a single-member district. 478 U.S. at 49, 106 S.Ct. at 2765. "The reason ... is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged

men, the district court will have to address the question of whether this situation would defeat plaintiffs' threshold showing or simply affect

practice, they cannot claim to have been injured by that structure or practice." *Id.* at 50 n. 17, 106 S.Ct. at 2766 n. 17 (emphasis in original). The resolution of the first *Gingles* factor, as well as the other elements of a vote dilution claim, "depends upon a searching practical evaluation of the 'past and present reality' [and] a 'functional' view of the political process." *Id.* at 45, 106 S.Ct. at 2764 (citations omitted). Because of frequent difficulties of proof and in light of the fact that vote dilution cases often become "prohibitively expensive," the Court espoused a "flexible, fact intensive test." *Id.* at 46, 73, 106 S.Ct. at 2764, 2778; *see also Citizens for a Better Gretna*, 834 F.2d at 502 (*Gingles* "suggests flexibility in the face of sparse data.").

Our circuit held, subsequent to the bench trial in this case, that a majority black voting age population in a proposed district was generally required to satisfy the first *Gingles* factor. However, where total population data demonstrated a "sufficiently large" minority population in a proposed single-member district, such data would also satisfy the first element of *Gingles* threshold test. *Brewer v. Ham*, 876 F.2d 448, 452 (5th Cir.1989). We reasoned:

The *raison d'etre* of *Thornburg* and of amended § 2 is to facilitate participation by minorities in our political processes, by preventing dilution of their votes. Only voting age persons can vote. It would be a Pyrrhic victory for a court to create a single-member district in which a minority population dominant in absolute, but not in voting age numbers, continued to be defeated at the polls. *Thornburg* implicitly recognized this fact: "Unless minority voters possess the *potential to elect* representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that practice."

*Id.* (quoting *Overton v. City of Austin*, 871 F.2d 529, 542 (5th Cir.1989) (Jones, J., concurring)). The appropriate method of establishing the first *Gingles* factor is a

the remedy to which plaintiffs would be entitled if a violation of section 2 is found." *Westwego*, 872 F.2d at 1205 n. 4.

"matter of fact" which the plaintiff must prove, but there is "no uniform method." *Id.* However, as *Brewer* stresses, unless a proposed single-member district contains a sufficient voting age minority population to possess the potential to elect its preferred representatives, redistricting is a hollow remedy.

Citizens sought to resolve the ambiguity we identified in our prior panel opinion by presenting minority voting age population data, minority voter registration data and evidence that blacks would have been able to elect the black candidate in the 1989 race for aldermen under a single-member district scheme. The district court refused to consider this relevant evidence and instead issued findings of fact and conclusions of law based upon what we had already found to be an unclear record. Simply reviewing the appellate record previously before us in order to make the requested findings was not responsive to our mandate *unless* there was no further evidence available. Hence, the district court should have consulted the parties as to the availability of additional evidence on whether a black voting age majority existed in any hypothetical district. Had the district court requested additional evidence, it would have discovered that Citizens purportedly had such evidence; and the district court erred in failing to seek or consider the proffered evidence.

## V.

We remand this case to the district court for further proceedings, including a hearing at which Citizens will have the opportunity to adduce the evidence referred to in their motion and, of course, the defendants will have an opportunity to respond. The district court should enter supplemental findings of fact and conclusions of law on the two issues discussed and on any other issues raised by the parties and the evidence referred to above. The case will be returned to this panel where a decision will be rendered on the existing record, as augmented by the hearing. No further notice of appeal need be filed by Citizens. The parties may submit supplemental briefs on

a schedule to be fixed by the Clerk. Costs will be assessed at the conclusion of this appeal.

We are reluctant to return this case to the district court before deciding this appeal. We are well aware that the commands of the Voting Rights Act are not always easily discovered. Nonetheless, we are equally firm in our insistence that there is more work to do.

REMANDED.