Revised February 5, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

Nos. 97-20345 & 97-20489
_____


ROSALINDA L PEREZ; DOLORES E GARCIA; MAGGIE RAMIREZ; ZINA
GONZALES; MARIA GONZALES; CELESTINO M PEREZ, JR; JENKY M
DIAZ; DAVID R SEGURA; RUDY N TREVINO; ROBERT MARTINEZ;
YVONNE RUTH; PASADENA CITIZENS FOR EQUITABLE REPRESENTATION,

Plaintiffs-Appellants,

v.

PASADENA INDEPENDENT SCHOOL DISTRICT; CARMEN OROSCO; DENNY
DELAFIELD; VICKIE MORGAN; BOB BLAIR; MARSHALL KENDRICKS;
HARVEY TURNER; JOHN ELAM,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____
January 29, 1999

Before KING, Chief Judge, and JONES, and SMITH, Circuit Judges.

KING, Chief Judge:

Plaintiffs-appellants, Hispanic residents of the Pasadena

Independent School District and an unincorporated association

consisting of individual plaintiffs-appellants, allege that the

at-large election system used by defendants-appellees, Pasadena

Independent School District and members of its board of trustees,

for choosing school trustees violates Section 2 of the Voting

Rights Act of 1965, 42 U.S.C. § 1973 (1994) (as amended).  The

district court found no violation and entered judgment in favor of defendants-appellees.  We affirm.

## I. FACTUAL & PROCEDURAL BACKGROUND[1]

Defendant-appellee Pasadena Independent School District (the PISD) is a political subdivision of the State of Texas that covers approximately eighty-five square miles in the southwestern part of Harris County, Texas.  The PISD includes the cities of Pasadena and South Houston, portions of Houston, and unincorporated areas.  The 1990 census found that approximately 190,000 people live in the PISD and that sixty-two percent of the total population are Anglo, thirty percent are Hispanic, and four percent are African-American.  During the 1991-1992 school year, the PISD had approximately 38,671 students attending fifty-one schools.  Forty-nine percent of these students were Anglo, forty-two percent were Hispanic, and five percent were African-American.

The PISD is governed by the Pasadena School Board of Trustees (the Board), which consists of seven members who are elected at-large by voters residing in the PISD.  Two or three positions are filled each year; each trustee runs for a specific

___

[1] The district court's thorough and well-reasoned opinion provides a comprehensive review of the facts and procedural history.  See Perez v. Pasadena Indep. Sch. Dist., 958 F. Supp. 1196, 1202-08 (S.D. Tex. 1997).  We therefore summarize only those facts necessary for the disposition of this appeal.

2

position on the Board and is elected by a plurality of the votes cast for that position. The individual defendants-appellees were the elected members of the Board in 1992. Only one member of the Board is Hispanic.

Plaintiffs-appellants (plaintiffs), Hispanic residents of the PISD and an unincorporated association consisting of individual plaintiffs, filed this suit in the United States District Court for the Southern District of Texas on November 19, 1992, alleging that the PISD's at-large election system deprives Hispanics of an equal opportunity to participate in the political process in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (1994) (as amended),[2] and the Fourteenth

---

[2] Section 2 provides in relevant part:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973.

3

and Fifteenth Amendments.[3]  Plaintiffs claimed that Hispanic participation in the Board elections is limited by the use of staggered terms without single-shot voting, the large population of the district, the comparatively small number of polling places, the absence of minorities as election officials, and economic disparities between the Anglo and minority communities. Plaintiffs sought a declaratory judgment finding the existing at-large election method unlawful and an injunction preventing any further elections using the at-large method.

The parties presented evidence to the district court from May 31, 1995 through June 8, 1995.  The district court heard additional argument and evidence of subsequent demographic changes on February 10, 1997 and entered an opinion and judgment in favor of defendants-appellees (defendants) on March 13, 1997.

The district court found that to prevail on their claim under Section 2, plaintiffs must meet the three-part test set forth in Thornburg v. Gingles, 478 U.S. 30 (1986):

> [F]irst, "that [the minority group] is sufficiently large and geographically compact to constitute a majority in a single-member district"; second, "that it is politically cohesive"; and third, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

---

[3] The district court dismissed plaintiffs' Fourteenth and Fifteenth Amendment claims after finding insufficient evidence of intentional discrimination.  See Perez, 958 F. Supp. at 1230. Plaintiffs do not appeal the dismissal of these claims.

Growe v. Emison, 507 U.S. 25, 40 (1993) (quoting Gingles, 478 U.S. at 50-51). The district court stated that if plaintiffs succeed in showing that the Gingles three-part threshold is reached, plaintiffs must also show that under the "totality of the circumstances" Hispanics do not possess the same opportunities to participate in the political process enjoyed by other voters, considering factors set forth in Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973) (en banc), aff'd sub nom. East Carroll Parish Sch. Bd. v. Marshall, 424 U.S. 636 (1976), and the Senate Report of the Voting Rights Act Amendments of 1982.[4]

---

[4] The Zimmer factors are as follows: (1) the extent of any history of official discrimination in the PISD that touched Hispanics' right to register, to vote, or otherwise participate in the democratic process; (2) the extent to which voting in the PISD is racially polarized; (3) the extent to which the PISD has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices that may enhance the opportunity for discrimination; (4) whether Hispanics have been denied access to a candidate slating process; (5) the extent to which Hispanics in the PISD bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; and (7) the extent to which Hispanics have been elected to public office in the PISD. See S. REP. NO. 97-417, at 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07 (citing Zimmer, 485 F.2d at 1305). Two additional factors that may have probative value in determining whether there is a violation of the Voting Rights Act are (1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of Hispanics, and (2) whether the policy underlying the PISD's use of such a voting practice is tenuous. See id. at 29; see also Brewer v. Ham, 876 F.2d 448, 451 n.4 (5th Cir. 1989).

The district court found that plaintiffs failed to establish the first element of the three-part <u>Gingles</u> test because they did not show that it is possible to draw one or more districts in the PISD with a majority Hispanic citizen voting-age population. The district court considered several proposed plans which would have seven single-member districts with at least one district containing a Hispanic voting-age population exceeding fifty percent. The district court found, and plaintiffs do not contest, that approximately sixty percent of the Hispanic population in the PISD are citizens, and therefore a proposed district must have a Hispanic voting-age population exceeding 62.5 percent for the Hispanic citizen voting-age population to exceed fifty percent.[5]

The district court rejected plaintiffs' argument that they only need establish that it is possible to create a single-member district in which the majority of the voting-age population, not the majority of the citizen voting-age population, is Hispanic. Plaintiffs alternatively urged the district court to accept their projections that at least two proposed districts would reach a Hispanic citizen voting-age population exceeding fifty percent as early as 1995. The district court rejected plaintiffs'

---

[5] The proposed district with the largest Hispanic voting-age population using 1990 census data had a 58.8 percent Hispanic population and a 52.9 percent Hispanic voting-age population.

6

projections as unreliable and used 1990 census data in its analysis.[6]

Although the district court found that plaintiffs failed to meet the first Gingles requirement, the court exhaustively considered the evidence presented, addressed the remaining two Gingles requirements, and considered the "totality of circumstances" using the Zimmer factors. The district court found that Hispanics in the PISD voted cohesively and therefore that plaintiffs had met the second Gingles requirement. The district court also found that Anglo voters generally had not voted for Hispanic candidates in PISD elections, but did not decide if this was the result of racial polarization meeting the third Gingles requirement. Finally, the district court evaluated the totality of the circumstances and found that plaintiffs had raised valid concerns that Hispanic citizens' participation in the Board elections was limited by voting barriers including a small number of polling places, the absence of minority election officials, and the operation of a slating committee. Nonetheless, the court determined that because plaintiffs had not

---

[6] Plaintiffs simply annualized the eighty percent growth rate of the Hispanic population in the PISD between 1980 and 1990 and applied that rate to the 1990 population data. Plaintiffs do not appeal the district court's rejection of this method of population projection, but argue instead that the district court should have taken a "more flexible approach" to the first Gingles factor by considering the total Hispanic population in the PISD, high Hispanic voter-turnout in Pasadena in 1995, and other "non-census" data.

met the "necessary precondition" of proving that it is possible to create a single-member district in which the majority of voting-age citizens is Hispanic, it "must find in favor of the defendants." Perez v. Pasadena Indep. Sch. Dist., 958 F. Supp. 1196, 1230 (S.D. Tex. 1997). Plaintiffs appeal.

## II.   DISCUSSION

Plaintiffs argue that the district court erred as a matter of law in entering judgment in favor of defendants because it created a "bright-line" rule that plaintiffs must demonstrate that a majority of the citizen voting-age population in a proposed single-member district is Hispanic. Plaintiffs further contend that the district court erred in finding that the majority of the citizen voting-age population in the proposed districts is not Hispanic because plaintiffs demonstrated that the districts contain a growing Hispanic population and have a demographic composition similar to that of districts that have elected Hispanic candidates. Finally, plaintiffs argue that the district court erroneously taxed them for defendants' costs.

### A. Standard of Review

We review de novo the legal standards a court applies to determine whether Section 2 has been violated. See Gingles, 478 U.S. at 79. We review the district court's findings on the Gingles threshold requirements and its ultimate findings of vote dilution, however, for clear error. See id.; League of United Latin Am. Citizens #4552 (LULAC) v. Roscoe Indep. Sch. Dist., 123

F.3d 843, 847 (5th Cir. 1997); <u>Overton v. City of Austin</u>, 871 F.2d 529, 532-33 (5th Cir. 1989) ("Reliance upon . . . the Court's voter dilution threshold analysis . . . [is] a fact-bound, intensely local inquiry highly dependent upon the district court's conclusions. As such, the clearly erroneous test applies to the district court's findings."). The application of the clearly-erroneous standard to findings on the <u>Gingles</u> threshold requirements thus "preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law." <u>Gingles</u>, 479 U.S. at 79.

B. Citizenship in the First <u>Gingles</u> Requirement

The Supreme Court has determined that the "right" question in vote dilution claims under Section 2 is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." <u>Gingles</u>, 478 U.S. at 44 (quoting S. REP. NO. 97-417, at 28 (1982)). As a matter of law, the use of at-large voting can impede the ability of minority voters to elect representatives of their choice only if the plaintiffs demonstrate that the group meets the three <u>Gingles</u> requirements. See <u>Growe</u>, 507 U.S. at 40; <u>Gingles</u>, 478 U.S. at 50-51; <u>Campos v. City of Houston</u>, 113 F.3d 544, 547 (5th Cir. 1997) ("Failure to establish any one of these threshold requirements is fatal.").

The first Gingles threshold requires that plaintiffs demonstrate that Hispanics in the PISD are "sufficiently large and geographically compact to constitute a majority in a single-member district." Gingles, 478 U.S. at 50. Plaintiffs argue that they have met this requirement because they proposed districts containing an Hispanic voting-age population exceeding fifty percent. We have unequivocally held, however, that courts "must consider the citizen voting-age population of the group challenging the electoral practice when determining whether the minority group is sufficiently large and geographically compact to constitute a majority." Campos, 113 F.3d at 548 (emphasis added). As we reasoned in Campos, such a result is required by the plain language of Section 2. See id.; see also Barnett v. City of Chicago, 141 F.3d 699, 704 (7th Cir.) ("We think that citizen voting-age population is the basis for determining equality of voting power that best comports with the policy of [Section 2]."), cert. denied, 118 S. Ct. 2372 (1998). The district court therefore correctly required that plaintiffs demonstrate that Hispanics would represent a majority of voting-age citizens in a proposed district.

C. Relevant Evidence in the First Gingles Requirement

Plaintiffs argue that courts should be "more flexible" in evaluating the first Gingles requirement and that it is possible to show that minorities have the ability to elect candidates of their choice even if they comprise less than a majority of voting

10

age citizens in a given district. In making this argument, plaintiffs rely on our decision in Westwego Citizens for Better Government v. City of Westwego, 906 F.2d 1042, 1046 (5th Cir. 1990) (per curiam), in which we recognized that "[m]inority voting-age population data, minority voter registration data and evidence of success by minority preferred candidates is relevant to the first Gingles factor." Plaintiffs assert that the district court erred in finding that Hispanics would not have the ability to elect a preferred candidate in the proposed districts because Hispanics represent a growing percentage of the total population and Hispanic candidates have succeeded in similar districts.

As we held in Westwego, however, evidence relating to elections in similar districts and the total population in a proposed district is relevant only in determining whether a majority of the voting-age population in the proposed district is Hispanic. See id. at 1045-47. "The appropriate method of establishing the first Gingles factor is a 'matter of fact' which the plaintiff must prove, but there is no 'uniform method.'" Id. at 1046-47 (quoting Brewer, 876 F.2d at 452). While such evidence may inform the analysis as to whether a minority group comprises a majority of the voting-age citizens in a proposed district and therefore reaches the threshold requirement, evidence that the group may succeed in electing preferred

11

candidates cannot remedy its failure to meet the Gingles threshold.

The district court considered plaintiffs' evidence regarding elections in similar districts and the projected growth of the Hispanic population, but the court found plaintiffs' projections unreliable. Furthermore, the court noted that the percentage of Hispanics voting in the PISD and in elections in similar districts has remained essentially unchanged since 1990 and that the rate of growth in Hispanic voter registration has increased at a slower rate than plaintiffs' Hispanic citizen growth projections. Faced with what it described as a "Hobson's choice between two unsatisfactory alternatives," the district court properly weighed the evidence and adopted the 1990 census data as the most reliable, and we find no clear error in its decision. Perez, 958 F. Supp. at 1212-13. We therefore affirm the district court's entry of judgment for defendants on the Section 2 claim.

### D. Costs

Following the entry of judgment in its favor, defendants filed a bill of costs with the district court on March 25, 1997. Defendants requested $162,745.17 in costs, including fees for court reporting, witnesses, expert witnesses, mediation, copies, and other related expenses under 28 U.S.C. § 1920 (1994).[7] The

---

[7] 28 U.S.C. § 1920 provides in relevant part:

A judge or clerk of any court of the United States may tax as costs the following:

12

district court entered an order on May 8, 1997 awarding $13,925.43 as costs for court reporting fees for depositions and for the cost of copying defendants' trial notebook, and plaintiffs timely appeal.

Plaintiffs argue that the district court erred in awarding defendants expenses for duplicating their trial notebook because defendants failed to provide receipts or obtain authorization from the district court for its exhibits.  See Zapata Gulf Marine Corp. v. Puerto Rico Maritime Shipping Auth., 133 F.R.D. 481, 484 (E.D. La. 1990) (disallowing "essentially undocumented" claim for copies of papers).  Plaintiffs also argue that the district court erred in awarding deposition costs because the depositions included questions on an issue that plaintiffs did not challenge and the depositions were not significantly used at trial. Finally, plaintiffs assert that the award of costs will discourage future civil rights lawsuits.[8]

---

> . . .
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
> . . .
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case.

Id.  Under Federal Rule of Civil Procedure 54(d)(1), "[e]xcept when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."

[8]  Plaintiffs also argue that the depositions were redundant and that the award was inequitable because plaintiffs lost on

13

We review the district court's award of costs to a prevailing party for abuse of discretion.  See LULAC, 123 F.3d at 848-49; Allen v. United States Steel Corp., 665 F.2d 689, 697 (5th Cir. Unit B 1982) ("The district court has great latitude in determining whether an award of deposition costs is warranted."). Factual findings made by the district court are reviewed for clear error.  See Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 256 (5th Cir. 1997), cert. denied, 118 S. Ct. 690 (1998).

We have reviewed the record and we find no abuse of discretion in the district court's award of costs.  The district court found that defendants listed the trial exhibits in the pretrial order and provided the court a copy of their trial notebooks.  See Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 335 (5th Cir. 1995) (requiring pretrial approval of exhibits for costs to be taxed).  Furthermore, plaintiffs neither challenge the necessity of the copies nor provide any support for their assertion that the district court abused its discretion by failing to require that defendants produce receipts.  See Duke v. Uniroyal, Inc., 743 F. Supp. 1218, 1227 (E.D.N.C. 1990) ("It is not necessary or desirable for federal courts to review receipts for every five dollar expenditure.  Judges, being former

only one issue and the public has benefitted from subsequent changes in PISD elections.  Plaintiffs did not raise these arguments before the district court, however, and we will not consider them in this appeal.

14

practicing attorneys, are quite capable of determining the reasonableness of expenses incurred during litigation."), aff'd in relevant part, 928 F.2d 1413 (4th Cir. 1991); cf. Zapata, 133 F.R.D. at 484 (finding Zapata's claim "essentially undocumented" because Zapata provided no information about what was copied, how the copies were used, or whether the copies were necessary).

Similarly, we are unconvinced by plaintiffs' argument that the depositions were investigatory and infrequently used at trial and that therefore the award of costs was an abuse of discretion. See Allen, 665 F.2d at 697 (finding no abuse of discretion where deposition fees were awarded for depositions that were not used at trial). Although plaintiffs highlight several places in the trial record where they state that they did not challenge whether the PISD is responsive to the Hispanic population, there is no indication, nor do they argue, that they conceded the issue prior to the subject depositions. Finally, we find no support for plaintiffs' assertion that the award of costs is an abuse of discretion because it may inhibit future civil rights lawsuits. See LULAC, 123 F.3d at 848-49 (affirming award of costs against plaintiff in Section 2 case); cf. Cypress-Fairbanks, 118 F.3d at 256-57 (finding no abuse of discretion in awarding school district costs in Individuals with Disabilities Education Act suit, although such an award may have a "chilling effect" on future plaintiffs). We therefore affirm the district court's order granting defendants $13,925.43 in costs.

15

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment and cost order of the district court.